## JAMES PATTERSON *v.* JESSE R. KIRKLAND.

1. PLEADING: JOINDER OF CAUSES OF ACTION.—A count upon the fraudulent representations of the vendor, in relation to the soundness of the chattel sold, may be united with a count upon a breach of warranty of soundness.

2. SALE: IF REPRESENTATIONS AS TO QUALITY ARE MADE, THEY MUST BE FULL.—If the vendor make any representations to the purchaser, in relation to the soundness of the chattel, he is bound to disclose all he knows on that subject.

3. SAME: WHEN VENDOR BOUND TO DISCLOSE A LATENT DEFECT.—Where the sale is for a fair price, the seller is bound to disclose the existence of a latent defect, if it be known to him, and be of such a character as would cause the buyer to decline to purchase.

IN error from the Circuit Court of Simpson county. Hon. John E. McNair, judge.

This was an action brought by Kirkland against Patterson, to recover damages for a breach of warranty of soundness of two slaves, sold by Patterson to Kirkland.

The first count in the complaint alleged that, on the 11th day of August, 1853, the said defendant proposed to sell to the plaintiff a

certain negro woman and her infant child, which he, at the time, represented to be sound in body and mind; and that the plaintiff, on the representation aforesaid, bought the said slaves, and paid therefor the sum of $900. "And the defendant then gave the plaintiff a bill of sale of said slaves, warranting them to be sound in body and mind, which said bill of sale has been lost. That plaintiff relied on the representations of the defendant, in reference to the soundness of the slaves; but that said representations were false and fraudulent, and so known to be by defendant when he made them." The averment is then made, that the slaves were unsound, and wholly worthless, and that the plaintiff offered to return them.

The second count alleged the sale, and a warranty of soundness by defendant, and that the slaves were unsound and worthless at the time.

The defendant demurred, because the two counts were improperly joined. His demurrer was overruled, and he then answered, denying the representations and warranty, and unsoundness of the slaves.

Upon the trial, the plaintiff proved, by one Grubb, that the negro woman was, at one time, owned by him; that she sometimes had fits; and that, in the spring of 1853, she was taken, "all of a sudden, in a strange way," and witness thought she was crazy. She was dangerous, and he put her in jail. Witness sold her, soon afterwards, to Patterson, for $600 ($100 of which he afterwards remitted), and, at the time, refused to warrant her soundness. Patterson refused to take a bill of sale without a warranty of soundness, saying, that he believed she was sound and not crazy, but only attempting to deceive, and that he would sell her as a sound negro.

Plaintiff proved, by another witness, that Patterson was in Brandon, in Rankin county, about the 10th of July, 1853, and that he there proposed to sell plaintiff a negro woman and child, which were then at Patterson's residence, in Simpson county. He represented the woman to be sound, and a good "field hand," and requested plaintiff to come to Simpson county and see them, which plaintiff promised to do in three or four weeks. About that time, plaintiff went to Simpson county, and, in a few days thereafter, the defen-

dant presented a draft from plaintiff in his favor for $900, and said it was for a negro woman and child he had sold to plaintiff, and that the woman was a number one field hand, and a tolerably good cook. This witness stated, that after Kirkland purchased the woman, he was acquainted with her condition, and that she was crazy at times, and utterly worthless.

He proved, by another witness, that he offered to return the slave and rescind the trade, and that defendant refused, and, at the same time, denied that he warranted them to be sound. This witness also stated that, soon afterwards, Kirkland showed him a bill of sale for the slaves, purporting to be signed by Patterson, and that it contained the usual clause of warranty of soundness, but that he did not know Patterson's handwriting.

He further proved, by witness Grubb, that the witness understanding that Patterson had got some money in Brandon, he called on him to get $200, being part of the $600 which Patterson had agreed to pay for the woman. Patterson did not pay the money, and said he was afraid the negro woman he had sold to Kirkland would take one of her "fool fits," and that Kirkland would come back on him. He also said that the money was at Mr. Hay's, and that he did not consider it his. This witness proved that the value of the woman, if sound, was $900.

The defendant proved, by one Brown, that the witness knew the negro while owned by Grubb and Patterson; that he did not consider her crazy, "but that it was all pretence." He saw the negro at work in Patterson's cotton-field. Witness was present when the sale was made, by Grubb to Patterson, and was asked to draw up the bill of sale. Grubb refused to warrant the soundness of the negro, and witness then said it was necessary that this fact should appear in the bill of sale. Patterson then refused to take a bill of sale, saying that it would injure the sale of the negro; and that he did not believe she was crazy, but that it was all deceit. Grubb replied that there was a great deal of deceit in the negro.

Witness, Williams, for defendant, stated that he knew the negro woman well, and believed her to be sound; that he had seen her at work,—scraping cotton,—at Patterson's. She scraped one row by herself, and hurried up a small negro to beat a larger one, and would occasionally help the smaller one. She performed her work

very well. The woman was owned by Patterson about four months, and during the time was delivered of a child, which was worth about $150.

One Rankin, for the defendant, testified that, on the day after plaintiff bought the negro woman and child from defendant, he had a conversation with plaintiff, in which he said, " that if the people about there had any mean negroes to sell, that then was the time to sell them." Witness asked plaintiff if he did not think that Patterson had got his finger in his eye? Plaintiff said not; that if so, he would like for some more persons to get their fingers in his eye. Plaintiff also stated, that he talked some with the negro, and that she talked with tolerably good judgment.

One Thomas, for defendant, stated, that Kirkland told him, the next day after he bought the woman and child, that he had made a good trade; that the negroes were likely, and cheap at $900. Witness saw the woman and child, at that time, and the woman looked sound and healthy.

Mr. Hayes, for defendant, testified that he was present, soon after the parties traded, and when Kirkland drew up the bill of sale. It was written with a pencil. Kirkland drew up a bill of sale in the ordinary form, containing a clause of warranty of soundness, and read it over to Patterson, and then offered it to him to sign. Patterson then dropped his head a few moments, and then raised up and said: " I don't like to sign that kind of a bill of sale." Kirkland said, why? Patterson then said, that he did not like that part of the bill of sale warranting the soundness of the body and mind of the negroes. Kirkland then said, " he would except or erase (witness could not say which) that part of the bill of sale," and he then handed the bill of sale to Patterson, who signed it. Witness did not see Kirkland make any erasure in the bill of sale, nor did he see Patterson read it, before he signed it.

It was also in proof, for plaintiff, that the child died soon after the purchase by Kirkland.

The instruction excepted to will be found in the opinion of the court. The plaintiff had verdict and judgment for $884 50, and costs, and the defendant sued out this writ of error.

*H. F. Johnson,* for plaintiff in error.

The substantial rights of parties to suits are not affected by the Pleading Act of 1850. Technical rules are not to be applied to pleadings to determine their sufficiency, but the allegations are to be "liberally construed with a view to substantial justice between the parties." *Copper* v. *Benson*, 28 Miss. R. 766; *McIntyre et al.* v. *Kline*, 30 Miss. R. 368. The *nature* of actions is not, neither can it be, abolished. An action to recover a debt is still an action *in debt;* an action to recover possession of land is still an action of ejectment, although the technicalities at common law in setting forth the cause of action are abolished. So of all other actions.

There are two counts in the amended complaint, and the plaintiff in error insists that they are improperly joined. The first sets forth false and fraudulent representations, which were inducements to Kirkland to make the purchase. This count does not rely upon a contract express or implied, but upon a fraud perpetrated upon Kirkland by Patterson. In other words, were it the only count in the complaint, it would clearly be an action *ex delicto,*—an action founded not upon a contract express or implied, but upon a *tort.*

The second count is upon an alleged warranty contained in a bill of sale executed and delivered to Kirkland by Patterson. It is upon an express contract. Where there is a breach of warranty, an action in assumpsit will lie, or an action on the case. 1 Ch. Pl. 137; Browne on Actions at Law, 384 (published in Law Lib. vol. 45). But let either form be adopted, and it is an action *ex contractu,* or *quasi ex contractu.* But the count now under consideration is in the nature of a count in assumpsit. Declarations in case for a false warranty must allege that it was false and fraudulent, or that the plaintiff was falsely and fraudulently deceived. See 2 Ch. Pl. 679, 680, 681, 683. But there is no allegation of fraud or deceit in this count. The warranty and breach are only set forth. The technical words, " undertook" and " promised," are not used; but the want of these does not change the nature of the count under the Act of 1850. For the form of a count in assumpsit on a warranty, see 2 Ch. Pl. 279. According to this view, the first count is in *tort,* the second on a contract, and they are improperly joined. Browne on Actions at Law, 561 (marg.); 1 Ch. Pl. 201. The Act of 1850 does not change the rule. " The plaintiff

may unite several causes of action, &c.    1st.  Where they arise out of contract express or implied," &c.    Pl. Acts 1850, p. 61.

The evidence did not justify the verdict.    As to the first count, there was no evidence to establish the warranty but that of Hayes and Jones.    Jones states that he told Patterson that he had given Kirkland a bill of sale, warranting the slaves to be sound ; but Patterson denied giving any such bill of sale.    He admitted he had given a bill of sale written with a pencil.    Kirkland afterwards showed Jones a bill of sale written with a pencil, and it contained a clause of warranty, but did not know anything more about it. Hayes states that he saw the bill of sale drawn by Kirkland ; that it was written with a pencil ; that it contained a clause of warranty; but that Patterson refused to sign it with that clause in it.    Kirkland said he would except or erase it, and Patterson then signed it without reading it, as witness saw.    It seems to me that a mere statement of the testimony refutes the allegation that there was a warranty.    Kirkland said he would erase or except that clause, and if he failed to do so, and Patterson signed the bill of sale under a false impression created by Kirkland, Kirkland himself is the party guilty of the fraud ; and the clause of warranty cannot stand, though it was not erased, for fraud vitiates everything.

As to the first count, there is no proof that any representations were made except those at Brandon, about a month before the trade was made.    Patterson evidently made them in good faith, because he insisted on Kirkland going down and seeing the negro before he would sell her.    But there is no evidence at all that those representations were the inducement for Kirkland to purchase ; on the contrary, we would conclude that, after examining the negro, he relied more upon his personal examination than upon representations made to him near a month anterior.    And, in addition to this, the conduct of Kirkland immediately after the sale affords strong proof that he relied upon his own judgment.    His conversation with Rankin and Thomas shows conclusively that he prided himself on his shrewdness in making the trade ; that, instead of Patterson having got the advantage, he had got the advantage himself. And the remark he made to Rankin, " that if the people about there had any *mean* negroes to sell, that then was the time to sell them," is strong evidence that Kirkland had been informed by

some one that the negro was in some respect defective, but that by his superior judgment he had discovered, as he supposed, that she was a sound negro.

To sustain the first count, it was necessary for the plaintiff to have proven that the negro was represented to be sound, that the representations were false, and that the defendant, Patterson, knew these to be false. *Chandelor* v. *Lopus*, 1 Smith L. C. 77, and the notes. Brown believed the negro to be sound, Williamson also. She appeared to be sound to Thomas and Rankin. Is there anything remarkable, then, that Patterson should also believe the negro to be sound, and that he honestly believed the representations he made at Brandon to be true ?

We are not sued for a fraudulent suppression of the truth. And though the jury may have believed from the evidence, that Patterson suppressed the truth, though of this there is no evidence, it did not justify them in their verdict. In making a trade, a person may rely upon his own judgment, or upon the judgment or representations of the vendor, or he may exact a warranty. In the first case, the vendor is not bound to disclose any fact at all. See American note to *Chandelor* v. *Lopus*.

*W. P. Harris*, for defendant in error.

The evidence abundantly shows that the woman continued subject to fits of craziness; that Kirkland, on discovering that she was thus afflicted, proposed promptly to rescind the trade, and that Patterson refused to refund the money. The evidence shows that the woman soon became worthless, and died.

The defendant asked the court, on the trial, to instruct the jury that Patterson was not bound to communicate the condition of the woman to Kirkland, and might rightly conceal it, unless Kirkland called upon him to do so; and that the refusal of the court to give this instruction, is here alleged as error.

But the proposition, that the owner of a slave subject to insanity, so much so as to be dangerous, may sell it to another, and lawfully conceal this fact from the buyer, and suffer him to place this dangerous person about his family, is monstrous. I cannot imagine a more diabolical spirit than that which would prompt a man, for the sake of money, to withhold a fact which not only seriously affects

the value of the property he sells, but one which so affects the safety of others. It was not only a legal duty, but every precept of humanity demanded the disclosure.

It is urged by the plaintiff's counsel, in his argument, that the evidence shows that Kirkland, on being told that Patterson had overreached him, said he would be glad if some others would treat him in the same way. But this was said shortly after the purchase, and before discovery by him of the condition of the woman; and, indeed, it only serves to show how completely he was duped by Patterson.

The witness who asked Kirkland if he did not think Patterson had cheated him, also testified that he believed the woman was sound, and worth the money. If he thought so, it is strange that he should have asked the question.

Grubb states that the woman, if she had been sound, would have been worth $900, but he sold her as an unsound negro. Patterson bought her as unsound, intending, at the time, to speculate on her, and to sell her as a sound negro. His declaration, that he believed her sound, was only intended to justify himself. He sold her to a man who lived in another county, and did not know her, and told him she was sound.

The mental disease under which she labored, was not apparent to the eye; and his misrepresentations were calculated to mislead the purchaser. The instruction, therefore, would have been improper.

It is also stated, as a ground of error here, that the court overruled the demurrer of the defendant to the amended declaration, because of a misjoinder of causes of action, and the common law doctrine on this subject is invoked.

The Statute of 1850 clearly authorizes the joinder of causes of action arising out of contracts, and abolishes the distinctions as to the forms of actions and pleas.

Both counts set out the same contract, and it was impossible to declare on the facts in any form, without setting forth the contract; and whatever cause of action existed, arose from the contract of sale.

The verdict was the just and natural result of the evidence on a question which is peculiarly addressed to the jury; there was a full

and fair trial, on facts fairly set out in the pleadings, and a right result obtained.

FISHER, J., delivered the opinion of the court.

This was an action brought by the plaintiff below in the Circuit Court of Simpson county, upon a breach of a warranty executed by the defendant, by which he warranted certain slaves, sold to the plaintiff, to be sound in body and mind. There is also a count in the complaint, that the defendant falsely and fraudulently represented, and falsely warranted the soundness of said slaves. The complaint was demurred to, on the ground that the causes of action were such as could not be joined in the same action. The object of the suit was to recover damages, resulting from the same transaction. The slaves being unsound, as alleged in both counts, at the time of the sale, the warranty of soundness was, of course, false, although the defendant may have been ignorant of the fact. The counts being such as could be united in the same complaint, the court committed no error in overruling the demurrer.

It is next alleged that the court erred in refusing to give the defendant's third instruction, which is as follows: " That the defendant, if not called upon by Kirkland to do so, was not bound to make any representations whatever as to the soundness or unsoundness of the negroes at the time of the trade; and, though the defendant may have known that the negroes were unsound in body or mind, yet the defendant was not bound to make any representations about their unsoundness, if unsound; and the concealment of it will not justify the jury in finding a verdict for the plaintiff." We think the court committed no error in refusing this instruction. It is objectionable, both as an abstract rule of law, and as not being applicable to the case. If the defendant made representations as to soundness, he was bound to state all he knew on this subject. Besides, in case of a latent defect, where the sale is for a full price, the seller is bound to disclose such defect, if known to him, especially when the disclosure may so far influence the purchaser as to induce him to decline the purchase. The defects here were latent, and, if known to the vendor, he was bound to disclose them.

Judgment affirmed.